Case number 21-7039. United States of America, ex rel. Vermont National Telephone Company and Vermont National Telephone Company, Abellant v. Northstar Wireless, LLC, et al. Mr. Lamkin for the Abellant, Mr. Waxman for the Eppley. So, good morning, Mr. Lamkin. Good morning. I guess I should start again. Thank you, and may it please the court. A civil money penalty proceeding is a proceeding to exact money as punishment for violating a law or regulation. Every time the phrase civil money penalty appears in U.S. code, it's used in that sense. The licensing proceeding after an option 97 wasn't such a proceeding. It addressed eligibility for licenses and for bidding credits. It wasn't to impose punishment for offenses against the United States. In fact, it's undisputed that the FCC didn't invoke. The FCC refused to invoke. The procedure is required for forfeitures. The one civil money penalty the FCC has statutory authority to impose. Defendant's primary argument is that a civil money penalty proceeding, and proceeding is a key term here, encompasses any proceeding where the FCC theoretically could invoke additional procedures and impose a penalty. But that converts almost every proceeding into a civil money penalty proceeding, including cases where the agency never asks for money, never invokes necessary procedures. It's a bit like calling a trial proceeding a sanctions proceeding because theoretically someone could ask for sanctions. So, I understand you to argue in part, if I'm correct, that in the proceeding that was brought, the commission, had it provided the necessary notice and opportunity, could have, in a sense, included that as part of the proceeding the commission did bring. It didn't necessarily have to start a new proceeding. That's correct. I think the FCC would have to have provided additional materials, either notice and opportunity, or it would have had to provide an opportunity for a hearing before the ALJ. But the fact that the FCC could have but didn't initiate proceedings or make this into a proceeding for a civil monetary penalty means that it wasn't a proceeding for a civil monetary penalty. All I was trying to clarify with my question was whether you see this other proceeding as the exclusive means by which the commission has authority to impose penalties. So, ordinarily, the commission would have its Enforcement Bureau begin to get a civil money penalty, and because the Enforcement Bureau has the exclusive authority in that context, and ordinarily the Enforcement Bureau does not have authority in the context of licensing proceedings, I don't think that necessarily precludes the possibility of the commission deciding during a licensing proceeding that it will convert it by providing the necessary notice and the procedures and then convert it into something where they could seek a forfeiture, the one civil money penalty that the FCC has statutory authority to obtain. But when it doesn't happen, I'm sorry. No, you go ahead, finish your sentence. I didn't know. When that doesn't happen, when the FCC doesn't convert the proceeding into one to obtain money as punishment for a violation for offenses against the laws of the state, then it isn't a civil money penalty proceeding. The mere hypothetical fact that it could have been one doesn't make it internal. Does any of this make any difference if you argue that the default payments in this case were not levied in the same proceeding as the commission's eligibility determination, and if that's right, do we have to even address any of these questions about the commission's authority in those proceedings? I think only to address the defendant's broader argument. The broader argument is that if it's conceivable that the commission could have converted the proceeding into one for civil money penalties, it is a civil money penalty proceeding, but the default payments... But that's the only question. If we agree with you that these are different proceedings, then that's the only other question we have to address. I think, yes, I think that's correct. I think if the default payments are a separate proceeding, and the licensing proceeding is not a civil money penalty proceeding, and the court doesn't need to go any further. But to address the default payments, since you bring it up, is I think their argument is that the default payment, their decision to default after the FCC decided eligibility, after it decided the bidding credit issue, somehow retroactively made the licensing proceeding into a civil money penalty proceeding. If that were right, if a decision by the defendant to default could convert an existing proceeding to a civil money penalty proceeding, anyone who's afraid of a QI-TAM action would have an easy way to buy immunity. Simply default on your cheapest license, and you've converted into a civil money penalty proceeding, and you don't have to face QI-TAM actions. But that would violate two statutory provisions. One is, apart from the default payments, as you mentioned, are not for the same allegations or transactions of fraud, the fraud alleged in the QI-TAM complaint, default payments aren't themselves civil money penalties, and they don't make things into civil money penalty proceedings. To borrow a phrase from Kukash, they're a punishment imposed and enforced by the state for a crime or offense against this law. And one reason it's clear is they apply to totally innocent bidders, someone who through no fault of its own defaults, it has a sudden reversal of finances, someone just doesn't come through with a loan, no fault of their own, but they're still subject to the default payments. And it's very hard to consider something punishment for an offense against the United States and its laws, where it's imposed on people who are wholly innocent, who just for happenstance end up defaulting. And the commission's rules clearly do permit default. It's a permissible course. If you look at Joint Appendix 959 and 963, the commission explains that it has allowed winning bidders to default selectively. Later on on page 960, 964, under the commission's rules, winning bidders choose to selectively default. This is a permissible choice for winning bidders. You can pay or you can default and accept those consequences. When default involves bad behavior, like misrepresentation or bad faith, that's when the commission goes to something that would be a penalty. And if you look at Joint Appendix 208, paragraph 241, it says, in those cases, the commission may take other actions it deems necessary. And it cites some of those penalty provisions. But when you have just the default, that's akin to a breach of contract. It's a no fault situation. And the consequences of that are akin to, they're simply akin to statutory damages or the like. They're not a penalty for an offense against the United States. Turning briefly to the same transactions or allegations. Default payments here aren't for the same fraud charged with complaint. It has to be the same transactions or allegations. And here, the default payments were a completely different item. Therefore, the defendant's permissible decision not to pay the licenses. Anyone can refute, can choose to default, whether or not their applications are opposed, whether or not they get bidding credit. And the default payment proceedings aren't remotely the same allegations or transactions that are underlying the suit. Returning licenses, like purchases and returns, are separate transactions from getting them. And returning property is a different transaction than obtaining it in the first instance. Turning briefly to materiality. Defendants, I think, conflate materiality with causation. That a defendant ultimately fails to meet one of many eligibility requirements doesn't make riskiness representations in connection with other important requirements in material. A doctor or an individual might submit a Medicare claim that falsely represents that he's a doctor, which is an eligibility requirement, that his treatment was medically necessary, also a requirement, and that he actually performed it. That the agency denies payment on one of those grounds doesn't convert all the other false statements into something that's immaterial. Each remains material because at the time made, each was capable of influencing the agency's decision. The fact that there's many doesn't make them all immaterial. And here, the falsehoods didn't merely allow defendants to exercise bidding for the option. When the payments came due on March 2nd, the fraudulently obtained credits allowed defendants to pay $10 billion instead of $13 billion, a $3 billion shortfall. That's material and causal. The false indications at least allow the defendants to avoid paying $3 billion when it otherwise would have been due. I know that the court- Is that your answer to the district court's conclusion that these were not material because the commission ended up denying the bidding credits anyway? Yes, I think that's right. Is that the answer to that? I think that conflates causation with materiality. The fact that in the end, the commission ended up denying bidding credits doesn't mean that the misrepresentations weren't material when made, that they didn't have the capacity to influence the outcome when made. And I think that's very clear here if you look at the nature of the misrepresentations. One of the critical misrepresentations is the omission of the fact that there was an agreement or an understanding that the spectrum licenses would be transferred at the end of five years from the SNR to DISH. That is absolutely disqualifying. On appendix, addendum page 20, we cite the regulations we produced. It's 1.2110B3 Romanat 4. And it says that an understanding to of a single license creates a material relationship that means that the other person's revenue is attributable to you automatically, per se. That's just disqualifying. That is an enormous, enormous barrier to qualification. If it were disclosed, it would be absolutely disqualifying. Now, the fact that other grounds came up, well, those other grounds were de facto control. And de facto control is a six-factor test under the Intermountain Microwave Test. And that's a test that's sufficiently unclear in application that the defendants litigated this all the way up to the Court of Appeals, all the way up to you all. And while the FCC's decision is reasonable, it made it clear that the test application was sufficiently unclear in advance that the degree of control that it would tolerate was sufficiently unclear in advance that the FCC couldn't abandon its practice of giving people who ran afoul of the test the ability to cure after they are found to have... Now, Mr. Lemkin, what about the district court's reliance on the FCC's stated practice of not looking at the short form? And that's part of, I think, her, the district judge's materiality analysis to say that even had this been disclosed, it would not have changed the timing and sequence of the payment. Yeah, so I think there's two answers. First, I think the government ordinarily would resist the notion that the fact that it doesn't look at representation certifications makes them immaterial. It sort of relies on people's good faith and making payments all the time. But even setting aside, it certainly was at least, there was enough review here, at the very least, to identify things would be facially disqualified. And it's not just if you look at appendix page 165 or 857, where the FCC says that the short forms will be used to determine eligibility, or that they looked at the forms that SNR and Northstar filed, quote, prior to auction and found them qualified. The Alexander case cited in our brief gives a pretty good example of the type of review that occurs. In that case, it found that Mr. Alexander was not eligible because of an undisclosed relationship with another bidder called SCI. And it found that relationship, among other things, because there was information that pointed it out in a biennial ownership report filed by the other party 18 months earlier. There were two phone calls with Mr. Alexander's counsel, and the commission ultimately denied his eligibility and said, denoted inconsistencies among the original application, the amended application, and Alexander's public statements. Clearly, it's not no review at all. There's some review there. It may not be the substantial and really probing review when you have an actual licensee, but there's some review there. And if the answer is, if the argument is, look, it's immaterial because they wouldn't have looked and they wouldn't have found enough of it, that's at most a factual issue for a trial. It's not an issue that results in motion. Mr. Lincoln, I'm a little surprised at your answer to Judge Pilgrim. I thought your answer to this issue was at the motion to dismiss stage, the only question here is whether they plausibly alleged the commission reviews and that your entire argument is about the merits or summary judgment, right? I think that's probably where I should have started. Yes, Judge Tatel. I see I'm well into my rebuttal time. If the court has further questions, I'm happy to either or not reserve my time for rebuttal. I was just going to say, could you just briefly address the question whether you plausibly alleged the fraud in the sense that the very factors that show de facto control in some sense seem to undercut the plausibility of the notion that Dish had an explicit agreement with these very small entities because it had so much of business, so much skin in the game, that why would it have even needed to have an agreement to transfer this spectrum? So the standard in the FCC is an agreement or understanding. So it doesn't have to be an explicit written description. It just can be an agreement or understanding. And I think that this is a case that's consistent with both the factor control and an agreement. And so it's not a case like Twombly where you have an alternative explanation that's inconsistent with what's pleasing to complain. In Twombly, the alternative explanation was independent action versus an agreement to restrain trade. Here, they're entirely consistent. And in fact, I think the de facto control makes it more likely that you have an understanding that the spectrum will be transferred. The controlling entity has the ability, because it's controlling, to make its expectations clear, to obtain acquiescence in the understanding. And there's no reason for it to leave the actual transfer of control of spectrum rights, the critical end point here, unclear, without a mutual understanding. Does it even mean that? Why can't it just, when it wants the spectrum, make that happen later? I mean, just because of the structure of the relationships. And so why doesn't the question about the plausibility of an actual explicit agreement or understanding go away precisely in light of the degree of control? And if the degree of control has already been remedied, then what is the materiality of the separate allegation of an understanding that the spectrum would be bought? You don't need the understanding if you're in charge from the beginning. So the de facto control doesn't necessarily mean that you have absolute and clear assurances that you will always be able to extract those licenses at the end of five years. And in fact, the fact that they were required or given the opportunity to cure makes that ability to demand the agreement or understanding that the spectrum transfer is even more important. Because they had an opportunity to cure, those elements of control might go away. They might have to bargain away. They might have to change the agreements that they're going to give the commission. Once you do that, that assurance isn't there anymore. And so you need the understanding or agreement, at least an understanding, that these are going to be transferred. Otherwise, you're taking a big risk that once you reduce the control, you're going to have a fight with the entity that you previously controlled. If there are any no further questions, thank you very much. Thank you. Thank you. All right. Counsel for Appellee. Thank you, Your Honor. May I just inquire to make sure that you can both hear me and see me? I can. Judge Pillars? Yes. Judge Mayhill? I can hear you this way. Please proceed. I'm going to try to boom. May it please the court. The government action bar aims to prevent QI-TAM suits where the government is already aware of the relevant allegations and it is able to court held. Vermont Telephone's QI-TAM complaint concerned the very same fraud allegations that Vermont Telephone had made to the FCC, which investigated them and rejected them in a separate section of its order. Okay. Mr. Waxman, even if you're right about that, it still has to be a civil money penalty proceeding. Right? That's right. Could you just focus on that, please? Yes, absolutely. The district court was correct that this was a civil money penalty because the FCC had- A civil money penalty proceeding. A civil money penalty, an administrative civil money penalty proceeding because the commission in that proceeding had full authority to impose civil money penalties upon any finding of fraud. In other words, if it had found that Vermont Telephone allegations were correct, it could readily have imposed civil money penalties. It didn't impose any because it concluded, and I'm quoting from paragraph 132 of the commission's order on JA 857, that, quote, Vermont Telephone had made no showing that SNR or North Star attempted to mislead the commission about their respective relationships with DISH. Now, let me go directly to what is- Just to interject so that I know the premise of the argument you're making now, Mr. Waxman, when you refer here to the administrative civil money penalty proceeding, you're referring to the possibility that the FCC could convene a hybrid licensing and forfeiture proceeding and impose forfeiture penalties for fraud, right? Not exactly. What I'm referring to as the proceeding is the administrative proceeding that was invoked by the Vermont Telephone's complaint. That petition alleged, among many other things, that it was not disclosed that SNR and North Star, quote, agreed to transfer to DISH the licenses they acquired and many, many other things. That began a proceeding, and that is the relevant proceeding in this case. Now, in their petition invoking this proceeding, and I'm referring the court to joint appendix pages 718 through 721, they said to the commission, because of this alleged concealment and misrepresentation, you should do two things. You should impose on a mandatory basis the default payments, which the commission and this court have repeatedly referred to as penalties, and Vermont Telephone's own complaint in this case refers to as a penalty. In other words, what they asked the commission to do is- They say two things, default and the other thing is refer this to the Enforcement Bureau. So, right. Now, what they said was, you should consider, and this is on 7, I believe, 719- Wait, wait, excuse me, Mr. Wexler. Judge Pillard's question was, the second was, refer it to the Enforcement Bureau for initiation of new proceedings. I think that's what she was asking. Actually, I, well, let me answer both that question and the question that I perhaps mistakenly had understood Judge Pillard was asking. As to new proceedings, the commission, the VTL asked the commission, there's no- VTL agrees the Enforcement Bureau has no authority in this because this arises out of a licensing proceeding. That's why the full commission adjudicated this proceeding. They said, you should do two things. Here's what you should do. Because of their fraud that we've now alleged in detail, you should declare them- You should declare them ineligible to receive these. You should re-auction all of these licenses, and you should, as a mandatory matter, require them to pay the 15 percent, what this court called fine, and in addition, make up the difference in the auction results up to $3.3 billion. They asked, they told the commission in that proceeding, in the very document that invoked that proceeding, that this is the penalty that they wanted. As I said, the complaint even correctly calls it a penalty. Now, second of all- Is there any more to that argument than effectively sort of a stopple of your opponent and nomenclature? I mean, what you're saying is that VTL came in and said, look, these people aren't eligible in the licensing proceeding, said you should recognize that they are not very small enterprises. Then the various things that you identified, which you're right, we have called penalties, fines, are the things that flow from the default, that you have to pay the difference between the re-auction price, you have to pay interest, you have to pay the 15 percent. You're not referring to anything other than that in this line of argument? So, I'm referring to, in this line of argument, let me shift quickly to the other, our principal line of argument. In this line of argument, our argument is that there were a billion, there was a half a billion dollars in what this court called fines, which were the direct result of VTL's petition, which had the result of denying them the bidding credits. And in the petition itself that initiated the proceedings, one of the requests for relief was that they be required to pay a 15 percent penalty on all of the bids that they won, 15 percent of the full undiscounted price, and up to 3.3 billion dollars to make sure that the commission lost no money. Is that any different from what the regulations provide when a successful bidder decides to give up some of the spectrum they won? As I share it, and maybe I'm not hearing what you're, what you're describing is what happens, what's available for the commission to impose. And I mean, I don't mean to, I don't mean to stop on this. You're right. I think you can move on to your next point, but I just want to make sure that that's. I want to, I do want to move on to my next point, but I will simply cite the court to 47 CFR 1.2106. No, I'm sorry. 1.2109C, which says that a winning bidder who's found unqualified or is disqualified for any reason after having made the required down payment will be deemed to have defaulted, and the penalties, and it refers to the actual default penalties, will be imposed. And that's the relief that they asked for here. It had nothing to do with choice at all. My principal point here on why this is a civil money penalty is that they made an allegation, they made detailed allegations of willful concealment and fraudulent misrepresentation. They suggested in their itself having suffered a forfeiture penalty in, by the way, a proceeding that was part and parcel of the proceeding that investigated and determined that they had failed to disclose one of their owners. The point here is that the argument that somehow it would have been a different proceeding if the commission had decided that forfeiture penalties were appropriate is completely without any foundation whatsoever. It didn't even happen in the case involving detail, but if the court wants an almost perfect analogy to this case, I recommend to the court the FCC's decision in NRA Mercury PCS2, which is reported at 12 FCC record 1790. That was a case in which the commission was evaluating a complaint made by a competitor of the winning bidder that the winning bidder should not be entitled to the license because it was covertly signaling its intentions to other bidders by including some ostensibly random numbers in its bid numbers. The commission investigated that. It found that there was reason to believe that that in fact had apparent liability for forfeiture in that proceeding. After considering the briefs and arguments back and forth, it imposed a forfeiture penalty and then on a petition for reconsideration decided to revoke it. But the point is it was done by the commission in the same proceeding because unlike here, it found that the allegation of misconduct was well-founded and the notion that somehow if the commission had determined that anything that VTEL was alleging in its petition in fact was true, that the commission could not have and would not have proceeded straightforwardly to issue a notice that it was going to consider forfeiture is utterly unsupported by the statute, the regulations, and a whole host of case laws showing that exactly the opposite occurs. That's really why the government action bar precludes it here because simply there can't be an argument that if the commission had credited what VTEL was saying in its petition, it could have imposed a money forfeiture. I also want to make the point that my friend is absolutely correct that only forfeitures under Section 503 of the Communications Act are the only civil money penalties. It is a commonplace for the commission and a private party that's been accused of violating a rule or regulation or whatever to enter consent decrees or settlement agreements that impose quote penalties for the misconduct. The notion that the only kind of civil money penalty that the commission can impose upon an allegation of fraud, concealment, misrepresentation is a forfeiture is wrong, but in any event, even my friend on the other side agrees that the full commission could readily have issued a notice of apparent liability which would have given VTEL an opportunity, which would have given DISH and North Star and SNR an opportunity to be heard on why they shouldn't, a forfeiture penalty shouldn't have been imposed, and the only reason that it did it, that it didn't do so, is because it found one, and I'm quoting from paragraph 132 of its order on page 857 of the appendix. Yeah, I think we're all familiar with that finding. Let me just ask you, though, that was the point of my first question to counsel for Applee and for Appellant, sorry, and he acknowledged, as I understood his answer, that in the proceeding that was brought, the commission could have, I think he used the word converted, but my question was if the commission had given proper notice and the opportunity, then would it not have had the authority to enter a penalty without technically invoking a separate proceeding? And the answer is absolutely. Absolutely. It is done. Okay, and so the question here is was sufficient notice and opportunity provided? And the answer is no, because the commission found in paragraphs, I think 128 through 135, 129 through 135 of its order, that it did not credit any of the allegations of concealment, misrepresentation, or fraud that had been made. So your argument, then, is that the commission first had to make the finding that it did not make, and then at that point give the notice and opportunity? Yes, exactly. That's exactly what section 503 of the statute in the implementing regulations provide. If the commission had adjudicating the complaint, or the petition in this case, found that there had been some misconduct, it could not impose forfeiture without giving notice of apparent liability. That's, in fact, exactly what happened in the Mercury PCS case. It's exactly what happened in the case involving Vermont Telephone itself. And the fact that the salient point here, if we're talking about whether the default payments were or weren't penalties, is that there are a boatload of cases, and we cite them, I think it's on page, yes, 30 of our brief, the New Jersey Coalition case, the Gately case, the Hill and Cox Corporation case, in which what happened was there was an administrative proceeding, the FCC in those proceedings, I'm not sure they were all FCC, actually, the agency in those proceedings imposed only what the court found was a compensatory order. And in each case, the court said, these were government action bar cases, in each case, the court said the government action bar applies, not because what was imposed was a, quote, penalty, but because if the agency had found more, it certainly could have imposed penalties. Right. And that's my question, Mr. Waxman. I appreciate that's one way to understand what not to look at what it was doing in the licensing proceeding as also substantively addressing the fraud claims. And we see that, and, you know, Mr. Lampkin points this out, that on the record before us, we don't see substantial material question of fact as to whether there was a lack of truthfulness, and I'm reading from GAA 857 paragraph 132. And so one way of understanding what they're doing is saying, you know, enforcement bureau can do what it wants, what we're doing today is the thing, is the minimum of what we have to do, which is decide the licensing question. And I guess what I'm asking you is, is there any suggestion that the FCC investigated the claim of an undisclosed agreement itself, or rules that somehow there just couldn't be such a thing that would, for example, stop the enforcement bureaus? They did decide to take this up. Like, has that issue actually ever been administratively adjudicated within the FCC? And if not, is that not part of your, how does that fit into your position? Well, our position, I'm really glad you asked that question. Our position is, as long as the, as long as the allegations were made, and the commission could have imposed civil money penalties, the fact that it didn't, whether it did or didn't investigate, is irrelevant. It falls within the, but that is, well. I'm just saying, makes an argument to me to reach an alternative ground. And I think, no, I'm going to reach only the ground that I think is adequate to support the judgment and, you know, let a different case that requires decision on that come before us. Why isn't that the better explanation? Judge Pillard, I would love to have this debate with you, but let me just go to the facts of this case. There is an entire section of the commission's on its paragraphs 129 through 135 of the commission's order, which is on pages 856 through 858 of the joint appendix, in which the commission says, VTEL also makes allegations that there was concealment and misrepresentation. And we find, one, that North Star and SNR made no material representations and hadn't, quote, attempted to mislead the commission about their respective relationships with DISH. As to the allegation of lack of candor, quote, we disagree. VTEL fails to identify any material factual information that applicants failed to to the commission. The commission found that their, quote, disclosure of their agreements and of the existence of their bidding arrangements was sufficient to comply with the disclosure obligations of the commission's rules. And I believe... What's your response to the government's statement of interest? That is, which states that the commission did not... Yeah, so I think, with respect, Judge Cato, I think you and my friend on the other side is misreading what the government's interest, government's statement of interest said. What it said is... Really? Yes. What it said is, we don't, it told Judge Collar-Catelli, we don't think you should stay this KTAM case because of the pendency of the case that was sub judice before this court at the time on the de facto control issue. Because in that proceeding, in the de facto control proceeding, there are no allegations of misconduct or otherwise. It relates to the finding that there was, and this court's opinion explains this in detail, it relates only to the commission's finding that based on all of the disclosed agreements, there was de facto control. And therefore, there is no need to stay proceedings on a KTAM action that is alleging that there were agreements that weren't disclosed. And that's obviously perfectly logical. I mean, the point of, it seems to me the government's position, what's really salient about the government's position with respect to this litigation is the fact that the government declined to participate in VTEL's KTAM suit. And although it has been, I can tell you, exquisitely aware of what has been going on both in these proceedings and in the de facto control proceedings, because it involves a determination about a whole lot of spectrum. It has declined to participate as an amicus or to intervene or otherwise participate in this dispute at all. But Mr. Axelrod, what the commission said and what your friend on the other side relies on is, I think it's summed up in, as it put note 69, that the commission said, we assume purposes of our analysis of the eligibility that the applicants provided us with, and that we therefore have been able to review copies and or summaries of all oral and written arrangements between themselves and DISH that would bear on their eligibility. So to the extent they're making a decision about fraud or not, candor or not, they're looking at the documents before them and they're leaving on the table the question whether any further investigation by an independent entity like Vermont Telecom would change that view, just not address one way or the other, which makes sense in terms of agency resources, frankly. Mr. Lampkin made very much an uphill battle when or if he gets to coming up with evidence of the fraud that he claims, but and maybe the government said that's just not our task right now. So I want to be very clear about this because I understand how you might have come to that conclusion, but it is, I think you need to understand if you look at the commission's order, the commission's order first deals with the question of is there de facto control based on the disclosure of the management agreement, the put agreement, the joint bidding arrangements, and all those other things. We have all those things. Is there joint control? And for purposes of that analysis, we are relying on, we are assuming that the facts, that the relationship is what was disclosed in those documents to convince us that there was de facto control. It then goes on starting in paragraph 129, which is 45 pages later in its decision, with a heading that says, that begins saying, VTEL also argues that there was concealment, misrepresentation, etc. And we are dealing with these on the merits right here in the paragraphs that I previously quoted to you. And they even include a footnote, and I can't remember the foot, I think it's 848, in which they say, we requested further information, in the course of our investigation, we requested further information, further documentation, etc., etc. from North Star and SNR. I mean, they absolutely adjudicated these claims of fraud, and in fact, investigated by multiple requests to the bidding entities to make sure that they had all the relevant documents, they had a bunch of questions that the bidders, the successful bidders responded to, and they then ruled on the merits that VTEL had made, hold on one second, VTEL had failed to identify any factual information that applicants failed to disclose. And so, the section that my friend loves to refer to is the section that says, okay, we're just going to look at the information and documents we were provided and make a decision on whether or not the fact of control is correct or not. Yes, we agree. Now, let's move on to their allegations of fraud. We disagree, and we investigate it. And, you know, I don't think that there could be any reasonable basis for dispute. The commission's order is very, very clear. It has its own heading for the allegations of misrepresentation and concealment. And over the course of seven paragraphs, it refutes those allegations. It'd be great if you would briefly address with Judge Rogers' indulgence the materiality question. Sure. If materiality, I understand that at least part of your position is that there's no materiality because the commission took action and did what it considered to be a full remedy for any and all disclosure failures that it perceived. And as you've just argued, it perceived those to be all the material disclosure failures. And so, everything's been remedied, which, I mean, in a way, sounds almost more in mootness than in materiality because under the Supreme Court's precedent, our precedent, we look at materiality ex ante, and we look at whether something is capable of or has a natural tendency to influence. And so, I wonder if the de facto control determination had gone the other way. Isn't it, shouldn't we assume that had SNR-NORSTAR just closed a plan to transfer spectrum to DISH, that that would under, is it, Endocino be material? So, I think the answer is, as the Supreme Court and your- Escobar. Sorry, Escobar. Yes. The Supreme Court in Escobar and this Court's decisions have made clear that when you're failure to make a statement could have, was capable of influencing the agency's decision. And it is 100% clear that where the agent, where the, whereas here the agency has said, based on the documents that were disclosed to us, we determined that you are not entitled to designated entity status. The fact that there may, allegedly, have been some other agreement that would also have convinced the commission to deny designated entity status is a, it's the textbook case of immateriality. If you have a statute that says- That's right. Is that right? Go ahead, Judge Teitel. When I was discussed, the question is whether it would have, whether the commission would have acted at the short-form stage. That's their argument. Well, that's their argument now, but let's, well, so there are two aspects of the- And this is, this is a motion to dismiss. They allege, they allege in the complaint that that's the case. Had the commission known about this at the short-form stage, it might have disqualified them then. No, no, I think, let me, let me, let me first disagree slightly with your predicate. If you look at their amended complaint at pages 68 through 70, they go to Payne's, I believe it's paragraph 128, but I could be wrong. They go to Payne's to say, what we are alleging is that if they, that there was a false certification and if the certification hadn't occurred, they would not have been allowed to get to bid or get the bidding credits. That's absolutely true. They do not allege that if the secret, the supposed secret agreement had been included in the short-form, that the FCC would have denied it. And in fact, they have pleaded themselves in their complaint. What about paragraph 61? An applicant, an applicant who fails to certify in its short-form application that it has disclosed all, all agreements will not be permitted to participate. That's right. That's absolutely right. That their claim was that we had a false certification and if we hadn't certified, we wouldn't have been able to participate. It was not that if we had certified as we did, and also included in addition to all the other agreements we described and attached, the, you know, the so-called secret agreement, that that in and of itself would have not allowed us to do that. And let me just, let me just, I'm sorry, let me just make, I'm sorry for talking on, but there are two references I really would like the court to look at. First of all, in the amended complaint itself, at paragraph 113, the complaint says, quote, the FCC does not independently examine the existence of de facto control prior to a spectrum audience. That's at page 92 of the joint appendix. Second of all, in the commission's order, and this is at page 860, the commission said that although it had now determined that SNR and North Star owed more than they originally deposited, or their original final payment, which functions as a deposit, quote, there had been no failure to pay the full amounts of the bids, nor had the commission permitted either applicant, quote, to take advantage of bidding credits to which it was not entitled. You're on page 860 there, Mr. Waxman? 860, yes. Paragraph? Whoops, I didn't write down the paragraph, but let me just go to 860. I also want to refer the court to 651. 860, paragraphs 129 and 132. All right, that's on 856 and 57. Thank you. Yes, I'm sorry. Well, wait a minute. Maybe there is something on 860. I may have been wrong. If you look at page 651 of the joint appendix, on the very first page of its notice of this auction, it says, and I'm quoting from footnote 3, a determination that a short form application is complete and complies with the commission's competitive bidding rules and policies is not determinative of an applicant's qualifications to hold a license or entitlement to a bidding credit. Now, let me make one further point in response to Judge Tatel's question and my friend's suggestion. The False Claims Act is not an all-purpose anti-fraud statute. It aims to protect the government against financial losses, either by paying out money that wasn't warranted or not getting money that it should have received. There is no allegation in this complaint. There is no support anywhere. And the commission itself has refuted the notion that because only $10 billion rather than $13 billion was deposited pending an adjudication of eligibility, that the government lost any money. And that's the only thing that the False Claims Act is concerned about. The government, I mean, if the argument that somehow the government lost money and therefore there can be a recovery under the would apply in every instance in which even absent any alleged fraud or misrepresentation or concealment, the commission determined, you know, we've looked at all, we've now evaluated all these documents and we decided you're not eligible for a designated entity status. Does that mean that the fact that consistent with the rules you applied for and were allowed to bid and made a deposit on your request for designated entity status, that the government was deprived of money because it ultimately determined that you weren't? I mean, it's just there's... Mr. Waxman, nobody's claiming that you don't need to establish fraud. Well, my only point here is that they have not alleged in their complaint. They haven't argued in their brief and there is no basis in the statute or the regulations for the contention that the government lost money in this case by virtue of the fact that only $10 billion was deposited and the commission later determined that the entities were not entitled to designated entity status and therefore had to pay $13.3 billion in order to get all the licenses. There's no argument here and there's no basis for an argument that that caused the government to lose money. If I can just, I know that I'm slightly over my time, but I know Judge Pillard, you got a question about plausibility and my friend had a response, you know, based on plausibility. Let me just say that as I understand it, his argument, I mean, Twombly absolutely establishes the proposition that dismissal is required if the facts alleged in the complaint are subject to a quote, obvious alternative explanation. And in this case, the defendant's conduct was entirely consistent with and explained by the agreements they disclosed. My friend's argument on the other side is, well, there wasn't a disclosure that there actually was an agreement or understanding that even though these two entities had put guarantees with a negotiated rate of return, they, there was no allegation that they actually agreed that this was going to happen. This court, well, the commission, number one, and then this court in its opinion made clear that there was absolutely no way that Northstar and SNR could avoid financial loss except by putting these options at the end of five years to dish at the agreed rate of return. That was a, that was a conclusion of this court and we're not disputing it. It was, it is correct. And so they're just, the facts that they are alleging here, they keep saying, well, they have some undisclosed expert who finds that there must have been some other agreement. That is not a conclusion. And if you look at every single fact that they allege in this complaint or every single fact that the commission knew about, there is, it's simply not plausible that there must have been some other agreement. Every agreement was disclosed. I mean, in their very petition to the 708 and 714, that SNR and Northstar agreed to transfer to DISH the licenses they acquired without disclosing that agreement in their applications. And when the commission reviewed that claim, it said, and this court also said, obviously there was an understanding that they were going to put these licenses to DISH within the 30-day period following the five-year regulatory exclusion because otherwise they had, there was no possibility that Northstar and SNR could make money. Why does that support your position? And not your opponent's position? So, I mean, the argument is, the plausibility argument is, boils down to, is there, is the conduct that actually occurred explained by the agreements that were disclosed? And what the commission found and what this court found in this respect in particular is, yes, including specifically an agreement or an understanding to transfer these licenses. There was a put right, which this court explained, talked about, and so did the commission, and made the point, you know, after explaining why Northstar and SNR won't be able to do this, and they won't have the money to do that, and they can't do this, and they can't do that, the only way they can make money in this case is by transferring the licenses, period. Are you saying there was disclosure of a plan to transfer? I'm a little bit confused because this sounds different from how you've argued this in your brief. Are you saying there was disclosure of an agreement to transfer? No, what I'm saying is, and this is on page 396 of the joint appendix, there is a, this is the short form disclosures, this is the one for SNR, but there's an equivalent one for Northstar, that these entities have a put right at the end of five years to put all these licenses to DISH at a negotiated agreed rate of annual rate of return, and what the commission found, and what this court, what this court stated was that when you take the economics of this arrangement between DISH and the two, and Northstar and SNR, it was blindingly clear, I mean this, I'm not quoting your, Judge Pillard, your language, I'm instead searching for it, but you have a discussion in the opinion for the court that basically says there was the only way that Northstar and SNR could ever not lose money, forget make money, is by in fact exercising their put options, and therefore there was an understanding that in fact at the end of five years this was going to to go to DISH, which is exactly what the details petition to the FCC alleged. And so there is an obvious, just as in Twombly, they're all of the facts, all of the transactions alleged are fully explicable by the facts and agreements that were disclosed, and therefore under Twombly and ITFAL, plausibility is not cited because there is a quote obvious alternative explanation. All right, why don't we have counsel, thank you counsel, thank you for a pellet. Thank you, your honor. I would like to make just three, I think four basic points. First, I think the key term here is civil money penalty proceeding, which is a, I think that defendant's view of that is just fatally overbroad. It covers any proceeding where the FCC hasn't invoked the procedures necessary to impose a civil money penalty, but it theoretically could. So the key fact is the FCC didn't invoke those procedures here, and there was no ability to impose a civil money penalty here, so it's very hard to see how a licensing proceeding looking at eligibility is in fact a civil money penalty proceeding. The consistent term of our civil money penalty is punishment for violation of the laws, and that's just not what the commission was deciding. Second, in terms of what the commission actually had before it, I don't believe that the commission had before it one of the key allegations here. As the DOJ's statement of interest emphasizes, non-disclosure of an agreement to transfer spectrum which would have been facially disqualified. And one of the key facts is any licensing proceeding, you do not have discovery. The commission does not have subpoena power. So the commission really had to assume that it had all the documents, all the agreements before it, which is why the Justice Department on page 59 of the appendix says, the FCC is thus operating under the assumption that defendants have made full and truthful disclosures. And then it goes on to say, for that reason, the government has a very strong interest in the discovery in this case, because if it uncovers the failure to disclose, that is important to the United States. That's exactly why there is, this is precisely the kind of case for which the QI-TAM statute is designed. It's one where the government did not invest its resources, but it could use the help of a private plaintiff to do it. The FCC hasn't redressed the fraud alleged to the complaint, including the undisclosed transfer agreement to transfer spectrum. The fact that there was a $3.3 billion involuntary loan, which is actually alleged on paragraph 135 of the complaint and on page 138 of the joint appendix. But isn't the mechanism for recovering from that forced loan, the default mechanism, which has been done and has addressed the loss to the government, including interest, including the 15%, I think you call it a restocking fee. So if you were, by hypothesis, to proceed and to prevail in this case, what would be, I'm not asking you to take a legal binding position, but just roughly, what would the measure of damages be given that, as Mr. Waxman has argued under the materiality banner, given that any harm caused by the alleged fraud has been fully remedied? Yeah. So while the statute itself doesn't require harm for it to be actionable, damages isn't an element. I don't think that the provisions for a default cover the fact that their first seven months, the very least, there was a $3.3 billion shortfall. It doesn't address the fact that swaths of spectrum now seven years out are still completely undeveloped. It doesn't address the corruption of the auction system, which caused when you have false certifications and it allows a very large entity to crowd out people who are actually eligible to bid. So the only, I mean, I find your complaint that you seek damages, but also there are the statutory, whatever it is, you know, 10,000, but beyond that, there's not a bigger stake here? I assume there was. Yeah, there is. So under Supreme Court precedent, our understanding is, I think the case is Oberson or something like that, but it says in effect that you do the troubling on the harm first. And if the government ultimately prevails and gets compensation, you actually deduct what the government got later on. And the government still has not gotten its default payments because the default payments, you don't know the amount. They depend on reaction and we don't have the reaction. I didn't mean to derail your, I would like you to address the last argument that Mr. Waxman made, which I may be wrong, but which I took to be effectively saying that an agreement, a put option, you know, amounted to effectively a disclosure of an agreement to sell. But please proceed through the four points you wanted to make. I'm sure my colleagues and I are interested to hear them. Oh, well, okay. Well, very briefly, look, in terms of paragraph 113, the complaint, whether the FCC examines for de facto control, the complaint says that, but that's because the FCC is relying on the representations and certifications that are filed. And so it doesn't do an in-depth analysis, but certainly if there's something on the face, like saying we're going to sell the spectrum at the end of five years, we've agreed to that, that would be disqualified. And I think there's actually certifications, and I apologize for not having it at my hand, but certifications that there is not actually an agreement to transfer control. There is perhaps an option, what they represent in their short forms is there is perhaps the option to put, but the compulsion to sell, that there's an understanding or agreement that you must sell, that is not disclosed. And that is what would have been absolutely and clearly disqualifying under the provisions in addendum page 20. If you have an agreement or even an understanding to sell, that you are going to do it, not that you have an option, that is disqualifying. You take all of the assets for that other party and you count them as belonging to the designated entity and it would be disqualifying here. And what's your response to Mr. Wexman's point that agreement to sell is perfectly plausible. It makes sense. It's the only way they could have the fact that there are all sorts of provisions in there that give them an incentive to sell is not inconsistent with and doesn't make it implausible that there was also an understanding that they would sell. Those two things are completely consistent. If you had two explanations, one of which excluded the other, that there was no agreement to sell because you have an option to sell under the put agreement, that might be a problem. But under Quambly, what you had there was you had two possible explanations, that it was independent conduct or that it was conduct that was concerted and therefore a violation of the antitrust laws. They were mutually exclusive. And the fact that one seems very likely rendered the other implausible. The fact that you have de facto control here does not make the possibility and the plausibility of an agreement to transfer spectrum any less because the de facto control could very easily have gone away and we do not, and the de facto control wasn't necessarily so complete, so complete that you would not have to resort to an agreement to enforce any agreement or to at least having an understanding that would be a sale at the end. In the end, look, plausibility would be a very fact-intensive analysis based on the complaint and the district court didn't address the issue of plausibility. The district court reversed or dismissed on grounds that I think are on its face legally incorrect. I would urge the court to reverse on those grounds. If there's a plausibility issue, we can fight that out and proper briefing in the district court, but I don't think there is. I think it's very clear that it's entirely plausible that in addition to everything else that was there, there was an agreement or understanding that they were going to sell that spectrum, transfer it to DISH at the conclusion of five years. And indeed, there isn't, that is now in process for at least one of the two entities. If there are no further questions, I thank the court and would cede any negative time I have left. Thank you. Any further questions by my colleagues? Thank you, counsel. We'll take the case under advisory.
judges: Rogers, Tatel, Pillard